JAMES C. TOOKE and BILLIE A. TOOKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
TOOKE v. COMMISSIONER
Docket No. 3652-72.
United States Tax Court
T.C. Memo 1977-91; 1977 Tax Ct. Memo LEXIS 346; 36 T.C.M. (CCH) 396; T.C.M. (RIA) 770091; March 31, 1977, Filed; As Amended April 4, 1977. J. R. Johnston, for the petitioners. H. M. Asch and J. Ross for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions to tax: Section 6653(b) [1]
Year
Deficiency
Additions
1959
$ 2,166.06
$ 1,934.11
1960
10,291.69
5,182.55
1961
11,449.16
6,022.45
1962
10,973.11
6,144.20
1963
8,767.08
4,383.54
1964
42,737.51
21,368.76
Concessions having *349 been made by the parties, the issues presented for decision are: (1) Whether any underpayments for any of the years in issue were due to fraud. (2) Whether petitioner is taxable on additional items of income paid to him by a partnership of which he was a partner or earned by him as a sole proprietor during the years in issue. (3) Whether there should be disallowed as a deduction alleged bribes paid public officials or the cost of entertainment of public officials, some such amounts having allegedly been paid by the partnership and others by petitioner's sole proprietorship. (4) Whether petitioner had unreported income during the years in issue attributable to certain bank accounts and rentals. (5) Whether petitioner is entitled to business expense deductions during the years in issue for certain expenses claimed by him. (6) Whether petitioner is entitled to additional business expense deductions for items not claimed on his returns for the years 1962, 1963 and 1964. (7) Whether petitioner is entitled to a bad debt deduction for a note which he alleges became worthless in 1960.
(8) Whether petitioner is entitled to an additional $249.12 sales tax deduction in 1963 *350 beyond the $180 allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time petitioners filed the petition herein, they resided in Castro Valley, California. Because the majority of events in this case revolve around James C. Tooke, we will refer to him as "petitioner." Petitioner attended the University of California at Berkeley, graduating in 1949 with an accounting major. He did not thereafter practice accounting or prepare income tax returns for clients. During the years in issue, petitioner was licensed by the State of California as a public accountant. After graduation, petitioner held various managerial or accounting positions for short periods of time. In 1952 petitioner obtained employment as a senior auditor-appraiser with the Office of the Tax Assessor of Alameda County, California.Petitioner ended his employment with Alameda County in March 1959. Thereafter, petitioner became a partner in the newly created partnership of Dawson, Desmond, Van Cleve and Tooke ("partnership"), which specialized in property tax consulting. Petitioner's association with the partnership continued until November 1963. Petitioner's *351 principal task as a property tax consultant was to represent businesses having personal property located within the county. Such representation included analysis and valuation of personal property, preparation of returns to be filed with the local assessor, and negotiations with the assessor or his delegate concerning the assessed valuation of the property. Prior to March 1959, the partnership of Dawson, Desmond and Van Cleve had conducted its property tax consulting business throughout the United States. In a Memorandum of Agreement, dated March 5, 1959, Dawson, Desmond and Van Cleve and the partnership agreed to divide the fifty states into two business spheres with the partnership receiving the ten western states of Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah and Washington, and Dawson, Desmond and Van Cleve reserving the remaining forty states. Dawson, Desmond and Van Cleve and the partnership also agreed that Dawson, Desmond and Van Cleve would transfer those of its clients located in the partnership's territory to the partnership in return for compensation under a fee allocation schedule. At the partnership's first meeting, the partners *352 agreed that petitioner would receive $25 per week as "escaping costs", i.e., reimbursement for costs incurred by petitioner which were too difficult to account for. These payments were made without regard to the profits of the partnership. Under the original version of the partnership agreement, petitioner was to receive the first $15,000 of profits and, in addition, one-third of all profits in excess of that amount. In October 1960 the partnership agreement was redrafted. The new agreement was substantially similar to the old one except in relation to petitioner's compensation. His initial share of the profits was reduced to $13,700, and a second category of partnership profits was carved out for petitioner, namely, a sales commission of 10 percent (decreasing to 5 percent after three years) of the gross fee of any business secured by him. Petitioner's share of any remaining profits continued to be one-third. A year later, the partnership agreement was again changed. By a letter dated September 1, 1961 from Tooke to his partners, the partnership agreement was modified to provide that all sales commissions earned by Tooke were to be paid to his closely held corporation, *353 Goldleaf Properties, Inc. ("Goldleaf"). No further changes were made until the partnership dissolved, effective November 30, 1963, pursuant to an agreement executed by all of the partners dated December 9, 1963. Fees received after November 30, 1963 for partnership work performed prior to that date were disbursed on the basis of the partnership agreement outlined above. The partnership maintained a systems and procedures manual which detailed the allocation of fee income and expenses between Dawson, Desmond and Van Cleve and the partnership. This manual, together with the partnership's financial statements, provided petitioner with sufficient information to ascertain income, expenses, and profit distributions. Petitioner's partners, Dawson, Desmond and Van Cleve, also owned and operated a corporation called Tax Management Associates. Petitioner was aware of Tax Management Associates' existence, the identity of its shareholders, and some of its activities, and had some dealings with the corporation. Expenses incurred by the partnership, by Dawson, Desmond and Van Cleve, or by Tax Management Associates were allocated among these three entities in accordance with agreed formulas. *354 On occasion expenses were allocated to an entity which had not directly incurred the expense. During the years in issue petitioner also performed property tax consulting work as a sole proprietor. Initially he operated under the name of Bureau of Property Research. Upon dissolution of the partnership in 1963, petitioner continued in the property tax consulting business under the name of James C. Tooke and Associates. Goldleaf also played a role in petitioner's activities. It was originally organized by his wife and another to conduct a smallscale real estate business. In 1961 petitioner bought out the other person. Soon thereafter, petitioner had the partnership pay to Goldleaf any sales commissions he earned, as noted above. Goldleaf's returns for 1961 and 1963 listed tax consulting as one of its activities, although all income from tax consulting was in fact earned by petitioner. From 1959 through 1964, the partnership, Dawson, Desmond and Van Cleve, Tax Management Associates, and petitioner (operating through Bureau of Property Research and James C. Tooke and Associates) made illegal payments to individuals, most of whom were employed in the offices of county property *355 tax assessors. These payments were claimed by the payors as deductible business expenses on their respective tax returns. From 1959 through 1963, the partnership made payments to the Assessor of Alameda County and to employees of that office to secure low property tax assessments for the partnership's clients. During these years, the Charter of Alameda County forbade county officers or employees from receiving anything of value from third parties. Each partner, including petitioner, knew that such payments were improper and illegal.
Arthur M. Spriggs, an auditor-appraiser with the Alameda County Assessor's Office in 1959, was one of the employees who secured unjustifiably low assessments for the partnership's clients. Spriggs also worked for several clients of the partnership on tax problems relating to property located in another county. Petitioner also had contact during these years with Michael J. McLaughlin, who was employed as an auditor-appraiser in the Alameda County Assessor's Office. McLaughlin first met petitioner in 1958, while petitioner was working on the Assessor's staff. In his capacity as auditor-appraiser, McLaughlin would randomly select and audit property *356 tax returns. In return for payments from petitioner on behalf of the partnership, McLaughlin would either assign a low assessment value to property owned by the partnership clients or not select for audit the returns of the partnership clients. Petitioner made payments to McLaughlin on behalf of Bureau of Property Research and James C. Tooke and Associates. In 1960 he paid McLaughlin $1,675 for the unjustifiably low assessment of Co-Op Garment Manufacturers, Inc. Earle T. Parrish was another member of the staff of the Assessor's Office of Alameda County. During the years in issue, the partnership and Bureau of Property Research or James C. Tooke and Associates made payments to Parrish in return for favorable treatment of their clients. Donald E. Feragen, the Chief Deputy in the Alameda County Assessor's Office, was also a recipient of illegal payments from the partnership. While serving as Chief Deputy, Feragen had informed petitioner that he would give petitioner's clients special treatment. This included, among other things, adjusting inventory below either cost or market value, reducing the useful life of equipment, and not auditing petitioner's clients. In 1963 Feragen *357 was elected the Assessor for Alameda County and held his position through 1964. After this election, petitioner and Feragen agreed that petitioner would file his clients' property tax returns with either McLaughlin or Parrish. In return for Feragen's favors, petitioner made payment to Feragen on behalf of the partnership equal to approximately 25 percent of the fee the partnership received from its clients. Eventually this pattern of illegal payments became the subject of official investigation. As a consequence of this investigation, Feragen was indicted and, on April 14, 1966, convicted of taking bribes from petitioner on eight separate occasions from 1960 through 1964 in violation of Cal. Penal Code, sec. 68. Feragen was also indicted and, on May 11, 1966, convicted of receiving bribes of $2,000 from petitioner on two separate occasions in 1964. Parrish was indicted in 1964 on two counts of grand theft in excess of $200. He pleaded guilty on December 15, 1966. McLaughlin was indicted on two counts of accepting bribes in 1964 and a third count of grand theft in 1964. He pleaded guilty to the third count, and in December 1966, the first two counts were dismissed. *358 Petitioner was indicted on one count of offering bribes in 1964, in violation of Cal. Penal Code, sec. 67, and on a second count of grand theft. Petitioner pleaded guilty to both counts on December 8, 1966. Petitioner's activities also extended to Donald James, who, during the years in issue, was an appraiser in the Assessor's Office of the County of San Diego. During the partnership's 1960 taxable year, the partnership made a payment of $550 to James. Sometime in 1963, petitioner met James and paid him $700. Petitioner soon thereafter submitted a bill to the partnership, which subsequently reimbursed him. The partnership deducted both these payments as business expenses. These transactions eventually led to a criminal proceeding in 1966 in which petitioner was a witness for the prosecution. James, on March 2, 1966, was indicted on multiple charges, including five counts of asking for or receiving bribes, in violation of Cal. Penal Code, sec. 68, and one count of conspiring to commit such a crime. The bribes involved in that proceeding included the amount of $700 transferred to James in 1963 from Dawson, Desmond and Van Cleve and petitioner, as individuals and as partners. *359 In return for James' agreement to testify before the San Diego County Grand Jury, the charges against him were dismissed. Desmond and Van Cleve were indicted along with James on multiple counts, including giving or offering bribes to executive officers in the San Diego County Assessor's Office and one count of conspiring between 1959 and 1963 to commit such a crime. Petitioner was included as a co-conspirator. Both Van Cleve and Desmond, on February 6, 1967, pleaded nolo contendere to one count of giving bribes, and the other counts were dismissed. This pattern of illegal payments also extended to San Francisco. One significant participant was Max J. Newstat, a supervising auditor-appraiser in the San Francisco Assessor's Office for twenty years, including the years in issue. Newstat's duties centered around personal property assessments for property having an assessed valuation of at least $15,000. Newstat processed the property tax returns for clients of the partnership and James C. Tooke and Associates, subject to approval by the Assessor, Russell L. Wolden. In return for the payments from the partnership and petitioner, Newstat extended favorable treatment to their *360 clients. For example, he assessed the inventory of their clients at ratios ranging from 25 percent to 40 percent rather than the usual 50 percent ratio. One of the clients receiving such favorable treatment from 1961 through 1964 was the Jack Tar Hotel, located in San Francisco. During the years in issue, the Charter of the City and County of San Francisco prohibited officers and employees from engaging in any activity in conflict with their duties. The rules of the Civil Service Commission required Commission approval of any outside employment. Newstat never sought such approval. Nevertheless, while employed by the Assessor's Office, Newstat performed property tax services for Dawson, Desmond and Van Cleve in the mid-1950's in various locales outside of San Francisco. He ceased working for Dawson, Desmond and Van Cleve around 1959, yet he continued to receive payments from them. In connection with these payments, Newstate submitted bills first to Dawson, Desmond and Van Cleve and later to the partnership for each of the years in issue. Desmond instructed Newstat how to prepare the bills, including the amount to charge and the date to submit them. Sometimes the partnership *361 itself prepared the bills. The partnership and petitioner desired these bills to enable the partnership to deduct these payments. On some bills, the partnership, or Tax Management Associates for the partnership, indicated that Newstat performed certain services which he, in fact, did not perform. In 1959 the partnership paid Newstat $2,200 in this manner. In 1961 Tax Management Associates paid Newstat over $9,000. The partnership absorbed $3,810.84 of this payment as an expense. One of the Newstat bills for 1961 was for $5,537.80. This bill recited that he had performed work for Tax Management Associates in relation to assessment of aircraft and airframe industries. Newstat, however, had not done this work. In 1962 Tax Management Associates paid Newstat $4,240.72. Dawson, Desmond and Van Cleve and the partnership allocated this amount like an expense, with $3,553.48 being charged to Dawson, Desmond and Van Cleve and $687.24 being charged to the partnership. One of the Newstat bills for 1962 was for $2,120.36 and falsely stated that he had performed "Professional Services--Assessment of Government Contract Industries--Possessory Interest, etc." In 1963 the partnership prepared *362 another false bill for Newstat.This 1963 bill was for $8,406.42 and purportedly related to an analysis of new appraisal approaches in Arizona. No such analysis was prepared. The sum of $8,406.42 was paid Newstat by the partnership in connection with this bill. Petitioner was aware of these partnership and Tax Management Associates payments and, throughout the years, helped arrange and facilitate Newstat's billing procedure. In 1964, after the dissolution of the partnership, petitioner prepared three bills for Newstat, one for $4,457, another for $4,458, and a final one for $2,185. Although some of these bills purported to be for services performed for James C. Tooke and Associates, Newstat had in fact never performed any such services. As was the case with the partnership, petitioner desired these bills to substantiate business expense deductions. Newstat's sister-in-law, Sylvia Glickman, was also involved in this system of payments. During the years in issue, she lived with Newstat. Desmond in 1956 arranged for Glickman to be carried on the books as doing clerical and stenographic work for Dawson, Desmond and Van Cleve in return for compensation. Glickman, however, could *363 not in fact type or take dictation. With the creation of the partnership, she began to receive her payments from the partnership. She continued not to perform any clerical services. Petitioner was aware of this situation shortly after becoming a partner in 1959. At least for 1959 any partnership payments to Glickman reduced the amount owed to Newstat for his services. Prior to 1960 she received $150 per month; beginning in 1960 she received $300 per month. Glickman used approximately half of these amounts to pay for expenses of the Newstat household, including groceries and utilities. In 1963, petitioner helped prepare Glickman's Form W-2. First the partnership and then in 1964 James C. Tooke and Associates labeled these payments as salary so as to deduct them on their respective Federal income tax returns, and did in fact deduct such amounts. Petitioner put Glickman on Goldleaf's payroll in 1964, although she still performed no clerical services. Goldleaf's payments to Glickman in 1964 totaled $4,272.54. Goldleaf prepared the accompanying withholding tax forms and employer's Form 941. Petitioner reimbursed Goldleaf for this amount and deducted the payment on his 1964 *364 return. Petitioner concedes that no payments made to or on behalf of Glickman are deductible. Besides Newstat, petitioner also made illegal payments to Wolden. In accordance with an agreement between Wolden and petitioner, Ralph Yeo (Wolden's conduit for bribes) submitted bills to petitioner which petitioner then paid. Petitioner wanted Yeo to submit these bills to substantiate deductions on his Federal income tax returns. Yeo performed no services in return for these payments. These payments in fact bought Wolden's cooperation in reducing assessments for petitioner's clients. Petitioner paid Yeo $2,500 in 1962 and in 1963 had Goldleaf pay Yeo $1,550 in relation to the Jack Tar Hotel assessment. Petitioner in 1964, while operating as James C. Tooke and Associates, paid Yeo $1,750 for the Jack Tar Hotel assessment and $3,750 for the American Can Company assessment. On October 28, 1965, Wolden was indicted on ten counts of bribery and one count of conspiracy, in violation of Cal. Penal Code, secs. 68 and 182. Four of the counts involved the following bribes from petitioner to Wolden: (1) a 1961 payment from petitioner in relation to the Jack Tar assessment; (2) a 1962 bribe *365 from petitioner through Yeo to Wolden in relation to the Jack Tar assessment for that year; (3) a 1963 bribe from petitioner through Yeo to Wolden in relation to the Jack Tar assessment for that year; and (4) a 1964 bribe from petitioner through Yeo to Wolden concerning the American Can Company assessment. There was also a conspiracy count which involved, inter alia, conversations by Wolden with petitioner in 1963 and 1964. In May 1966, Wolden was found guilty on all of these counts. From 1959 through 1963 the partnership made the following payments to public officials or their relatives, or was allocated a portion thereof by Tax Management Associates: Name
1959
1960
1961
1962
1963
Max J. Newstat
$2,200
$3,810.84
$ 687.24
$ 8,406.42
Sylvia Glickman
742.50
$3,813.60
3,844.40
3,300
3,845.75
Art Spriggs
2,062.50
600
Michael
3,544.95 [2]
McLaughlin
Orion Baker,
366
employee
of California's
State
Board of
Equalization
Don James
550
700
TOTAL
$5,605
$8,274.55
$7,655.24
$3,987.24
$12,952.17
Increase in
$1,868.33
$2,758.18
$2,551.74
$1,329.08
$ 4,317.39
petitioner's
distributive
share of
partnership
taxable
income
*366 On the partnership's state income tax information return filed with the State of California for the fiscal year ended November 30, 1959, the partnership deducted $9,000 of bribes to public officials under such varied labels as "professional fees", "handling costs", and "service costs." No partnership return was submitted into evidence for fiscal 1960. On the partnership's Federal income tax information return for the year ended November 30, 1961, appear the categories "Handling Costs of Contracts", $3,166, and "Service Cost of Contracts", $1,188.67. On the partnership's return for the year ended November 30, 1962, there appear the categories: "Handling Cost Contracts" $3,016.22, "Service Expenses Clients" $1,250.43, "Professional Fees" $7,624. On the partnership's final income tax return, it deducted $1,070.63 for "Handling Costs--Contracts", $775.50 for "Professional Services", and $75.14 for "Service Expense-Clients." The above categories *367 cover bribes paid to public officials. The partnership also paid payroll taxes of $225.18 on the "wages" paid Glickman in 1962. The partnership spent the following amounts on the entertainment of public officials, which respondent determined are not deductible from petitioner's income: Year
Amount
Petitioner's 1/3 Share
1959
$ 182
1,109.81
$1,291.81
$ 430.60
1960
1,134.40
378.13
1961
771.50
257.17
1962
364.64
121.55
1963
277.73
92.58
The partnership deducted these amounts on its partnership returns. In accordance with the 1959 agreement among the partners to reimburse petitioner $25 per week, the partnership paid petitioner the following amounts labeled "escaping costs": Year
Amount
1959
$1,025
1960
1,300
1961
1,350 [3]/
1962
1,300
1963
1,100
Petitioner kept no receipts or records of his expenses. In 1961 petitioner, in his capacity as a partner, did property tax work for the Jack Tar Hotel for a fee *368 of $9,409.60. Petitioner deposited this payment in Goldleaf's bank account. Out of this fee, he paid Dawson, Desmond and Van Cleve $3,450.18. The remaining $5,959.42 was income to the partnership. In 1962 petitioner dealt with the hotel in his capacity as a sole proprietor, receiving $6,675.34 as a fee. Petitioner again deposited this fee in Goldleaf's bank account. Out of this fee he paid Dawson, Desmond and Van Cleve $2,447.60. The remaining $4,227.74 was income to petitioner, rather than the partnership. In relation to this fee, Goldleaf paid Ralph Yeo for the benefit of Russell Wolden $2,500, as noted previously. In 1963, acting in the same capacity as in 1962, he received a fee of $5,000 from the hotel, paying $1,833 over to Dawson, Desmond and Van Cleve.The difference of $3,167 was income to petitioner. In relation to this fee, Goldleaf paid Ralph Yeo $1,550 for the benefit of Russell Wolden, as previously noted. On his 1960 individual return (Schedule C), petitioner claimed a deduction of $7,575 for "Professional Services." On his 1961 return, in the category labeled "Professional Fees" on Schedule C, he deducted $4,559.81. On his 1963 return, he deducted $3,201.72 *369 for "Commissions Paid." On his 1964 return, he deducted $16,284.94 for "Handling Cost-Contracts", $2,623.74 for "Service Expense-Clients", and $12,662.50 for "Professional Services." These were the labels under which petitioner deducted the bribes he paid to various public officials. On his individual returns for 1959 through 1964 petitioner omitted certain items of income derived from his interest in Bureau of Property Research and James C. Tooke and Associates. Omission of these items totaling approximately $44,000 has been explicitly conceded by petitioner. [4]
Petitioner also failed to report on his income tax returns certain payments which he received directly from the partnership as follows: Year
1961
Unreported gross receipts
$2,693.35
Pacific Play Togs
1,500.00
Commissions
Jersey Shore Steel
$ 34.62
MJB
25.00
Gerber Foods
400.00
OliverTire &
2.50
Rubber Co.
Pacific Tire Co.
25.00
487.12
TOTAL
$4,680.47
1962
Partnership Commission
$ 712.31
Partnership Commission
6,124.00
TOTAL
$6,836.31
*370 He directed that each of these payments be made to Goldleaf, although they represent petitioner's income.
Petitioner indirectly received another $2,600 from the partnership in the following manner: In 1960 the partnership paid McLaughlin $6,000; McLaughlin then paid $2,600 of this sum to petitioner. Petitioner did not report the receipt of this sum on his 1960 income tax return. Petitioner also received but failed to report income he received from Tax Management Associates in 1961, totaling $5,929. Petitioner claimed business expense deductions in relation to his individual consulting business for items which were either gifts, capital expenditures, personal expenses, or which were nonexistent. In 1960, his brother, David L. Tooke, came to California from Ohio to be trained in real estate and property tax matters. In that year petitioner paid his brother $4,000, and in 1961, $4,207.81, and deducted these sums from his individual returns. His brother, however, provided no services to petitioner in return for these payments. In 1960 petitioner, acting as a sole proprietor, made payments of $1,675 to Michael McLaughlin and $1,650 to Ralph Yeo and deducted these sums from his *371 returns. These payments were made to secure low assessments for petitioner's clients. In 1961, in relation to his rental activities, petitioner deducted the cost of new furniture under the category of repairs. In 1963 petitioner deducted certain expenses incident to the dissolution of the partnership for which he subsequently received reimbursement from the partnership, comprising a $1,026.13 payment to Norman Phillips and a $123.83 telephone bill. In that year he deducted another $503.19 as a business expense and $567.17 as a travel expense. In 1964 he deducted $2,126.75 as a business expense. In 1963 and 1964 petitioner's spouse drove a Cadillac. She occasionally used the car to conduct her real estate business and to aid petitioner's business, but, for the most part, used it for her personal transportation.Petitioner deducted operating expenses for the car of $1,528.47 in 1963 and $1,840.52 in 1964. Petitioner in 1964 made the following payments to individuals in relation to his tax consulting business: Michael McLaughlin
$ 300
Max Newstat
4,457
4,458
2,185
Ralph Yeo
1,750
Earl Parrish
2,000
2,000
Petitioner made these payments to *372 secure favorable property tax treatment for petitioner's clients. Distinct from his tax consulting activities, petitioner and his wife had other unreported income, including gain from the sale of a parcel of land and interest income. Petitioner also had rental income which he failed to report in 1960 of $236.83 and in 1961 of $1,230.19 (excluding lease deposits of $275). [5] Petitioner had $503.60 of unreported rental income in 1962, composed of $423.60 of unidentified deposits and $80 of income included on his books but not reported. In 1963 petitioner had $1,157.35 of unreported rental income, including $157.52 of income indicated on his books but not reported on his return and $999.83 of unidentified bank deposits. In 1964 petitioner had $900.79 in unreported rental income, including $303.79 of income on his books but not reported on his return, $529.69 of unidentified bank deposits and $67.31 of income from Service Distributors, Inc. for use by his tenants of their laundry equipment. *373 In 1959 petitioner made two deposits in his bank account, totaling $455. This was income to him. In 1960 petitioner loaned Art Spriggs $1,550. Spriggs disappeared and petitioner was thereafter not able to locate him. The loan was never repaid. In 1963 petitioner purchased a Lincoln automobile and paid $249.12 in sales tax as part of the transaction. In relation to other 1963 purchases, petitioner paid $180 in sales tax. Petitioner during the years in issue compiled books and records for Bureau of Property Research, James C. Tooke and Associates, Goldleaf and his rental business. The bulk of petitioner's records were taken, without his permission, from his office in mid-1965. These records came to rest in the Attorney General's Office for the State of California and subsequently were distributed to the offices of local county district attorneys throughout California for use in criminal proceedings.Respondent received copies of the records. Petitioner subsequently made some efforts to retrieve his records but was unsuccessful. Respondent permitted petitioner to go through the copies which had been distributed to respondent. During respondent's audit of petitioner's *374 individual returns, petitioner provided the auditing agent with his rental records. Petitioner also provided the agent with a ledger containing a check register and income notations. The auditing agent found no entries for income from property tax activities and observed that more income was reported on Goldleaf's returns than was on Goldleaf's books. From the agent's analysis of Goldleaf's bank deposits, he was able to determine that petitioner had deposited property tax consulting income into Goldleaf bank accounts. Michael J. McLaughlin aided petitioner in the preparation of Goldleaf's books and records. McLaughlin organized Goldleaf's books of original entry as well as Goldleaf's ledger. In addition, he prepared the corporate income tax returns for Goldleaf from 1959 through 1963. Petitioner supplied McLaughlin with Goldleaf's journals and ledgers in each year from 1959 to 1963. Such books and records pertained only to real estate operations. The corporate returns were usually filed after their respective due dates because petitioner did not supply McLaughlin with the necessary records until after the filing date. McLaughlin also prepared the joint individual income *375 tax returns for petitioner and his wife for the years 1959 through 1964. For each of these years, petitioner did not request that McLaughlin prepare these returns until a day or two before the filing deadline. McLaughlin returned the completed returns to petitioner on the evening of April 15 of each year. Petitioner normally examined the returns with some care before signing them. Generally the information petitioner provided McLaughlin was already arrayed in summary schedules composed of general categories, such as travel or entertainment expense. Petitioner did not make available to McLaughlin any other information or inform McLaughlin that he could have access to any other information. For 1964 petitioner provided McLaughlin with a summary schedule of income and expenses as well as a general ledger. When McLaughlin examined the ledger, he saw the specific items which composed the $29,645.18 "Professional Fees" category on the summary schedule. These items mainly involved payments to members of the staff of assessor's offices, including McLaughlin, Parrish and Newstat. McLaughlin deleted this professional fee category as a deduction and also lowered total gross income *376 by the same amount. He discussed his action at length with petitioner before petitioner signed the return. McLaughlin told petitioner that the deleted income had to be reported either on Goldleaf's return or his own. Petitioner, however, never filed a return for Goldleaf in 1964 and signed his own return without revising it. Respondent sent a statutory notice of deficiency to petitioner on February 18, 1972, containing the determination of deficiencies in Federal income tax and additions to tax for fraud under section 6653(b) set forth at the outset of this opinion. OPINION From 1959 through 1964 petitioner was active as a property tax consultant in California conducting business through a partnership (Dawson, Desmond, Van Cleve and Tooke) and a sole proprietorship. One significant aspect of his activities was to secure favorable property tax treatment through the use of bribes. An array of criminal convictions, encompassing assessors, members of their staffs, petitioner, and his partners flowed from petitioner's activities. Respondent has determined deficiencies in petitioner's Federal income tax for the years 1959 through 1964, arising from omitted income and overstated *377 deductions. Respondent has also asserted the fraud penalty against petitioner in each of these years. The parties agree that the years 1959, 1960 and 1961 are barred by the statute of limitations unless we find fraud in these years. Sections 6501(a) and 6501(c). Stone v. Commissioner,56 T.C. 213, 220-221 (1971). I. Fraud.
Respondent has determined that petitioner is liable for additions to tax for fraud (section 6653(b)) [6] for each of the years in issue. For fraud to be present, we must find that petitioner acted with the specific intent to evade a tax believed to be owing. Estate of Temple v. Commissioner,67 T.C. 143, (1976); Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941), *378 revg. and remg. 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941); see Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958) (failure to file). The burden of proving that part of the petitioner's underpayment for the years in issue was due to fraud is upon respondent (section 7454(a)), who must prove fraud by clear and convicing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner,276 F. 2d 122, 128 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,53 T.C. 96, 106 (1969). He may meet this burden with circumstantial evidence. Powell v. Granquist,supra at 61. The issue of fraud poses a factual question which is to be decided upon an examination of all the evidence in the record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). And respondent must establish fraud for each individual year in issue. Stone,supra at 220. For the reasons set forth below, we hold that respondent has sustained his burden of proving fraud for each of the years 1959 through 1964, *379 thereby also lifting the bar of the statute of limitations for the first three years. A. Credibility.
We found petitioner to be almost completely lacking in credibility. His narrative was occasionally vague, often inconsistent, and frequently changing. Another sign of untrustworthiness was petitioner's assertion at trial that his 1965 testimony before the Grand Jury of Alameda County, California, while under oath, was false. Such a candid admission of past perjury does little to support his claims of present honesty. We also found petitioner's spouse not to be an exemplar of truthfulness. In contrast to petitioner and his wife were respondent's witnesses, Michael J. McLaughlin and Max J. Newstat. Although both possessed tarnished pasts, nonetheless each answered his questions at trial forthrightly. We have drawn no negative inferences from the incomplete nature of petitioner's books and records. We have found as a fact that his records were taken without his knowledge from his office and thereafter used in various criminal proceedings. Compare Anderson v. Commissioner,250 F. 2d 242, 245-246 (5th Cir. 1957), affg. and remg. a Memorandum *380 Opinion of this Court, cert. denied 356 U.S. 950 (1958); Shaw v. Commissioner,27 T.C. 561, 574 (1956), affd. 252 F. 2d 681 (6th Cir. 1958). B. Petitioner's business background.
One relevant factor in an inquiry into fraud is the degree of accounting experience and the general business background possessed by the taxpayer. Cf. Lord v. Commissioner,525 F. 2d 741, 745 (9th Cir. 1975); L. Schepp Co. v. Commissioner,25 B.T.A. 419, 438 (1932). Petitioner possessed college training in accounting, had performed services as an auditor-appraiser, and by 1959 was a partner in a property tax consulting partnership. For each succeeding year in issue, it seems reasonable to conclude that his commercial expertise and general business experience increased. Although he did not prepare Federal income tax returns for clients, we conclude that his general business and accounting background supports an inference that he was acquainted with proper accounting procedures and was familiar with accounting notions *381 of income and expense. C. Omissions of income.
A second, relevant, though not dispositive, factor is omitted income. Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. Respondent has shown by clear and convincing evidence that petitioner has failed to report on his income tax returns income that he received during the years in issue. Other omissions were conceded by petitioners. Repeated omissions of income are indicative of fraud. Merritt v. Commissioner,supra.
D. Pattern of false or misleading billings to substantiate deductions.
Fraud may arise in the content of deductions as well as in omitted income. Benes v. Commissioner,42 T.C. 358, 383 (1964), affd. 355 F. 2d 929 (6th Cir. 1966), cert. denied 384 U.S. 961 (1966). We have found as a fact that petitioner was aware of and participated in the partnership's creation of false *382 bills from recipients of bribes in each of the years 1959 through 1963. Eck v. Commissioner,16 T.C. 511, 513-514 (1951), affd. per curiam202 F. 2d 750 (2d Cir. 1953), cert. denied 346 U.S. 822 (1953). Compare Estate of Roe v. Commissioner,36 T.C. 939, 948 (1961). The partnership required the recipients of its largesse to prepare bills (often the partnership itself prepared the bills) to make it appear that the recipient had performed some type of customary, commercial service for which he required payment. The partnership wanted these bills so that it could substantiate its deductions of these bribes in the event of an audit. This purpose and this pattern of billings suggest that the partners, including petitioner, wished to conceal the actual nature of expenses which they were deducting knowing that their bribes would not be allowed as deductions if they were identified as such in the returns. Additionally, in each of the years 1959-1963, the partnership prepared bills for Max Newstate which stated that Newstat rendered certain services which in fact he never performed. Petitioner continued this pattern *383 of false billings in 1964 when operating as James C. Tooke and Associates. In 1964 petitioner also had withholding statements prepared for Sylvia Glickman, even though he knew she had performed no clerical services. At trial he continued to assert that these payments were for legitimate services, untrue assertions which at least suggest that the necessary intent existed not only at trial but also during the years in relation to which he was testifying. See Beaver v. Commissioner,55 T.C. 85, 93 (1970) (failure to file; false statement by petitioner during respondent's investigation). E. False or misleading statements on tax returns.
Another significant factor in an inquiry into fraud is the presence of false or misleading statements on the tax returns for the years in issue. Coast Carton Co. v. Commissioner,149 F. 2d 739, 742 (9th Cir. 1945) (petitioner deducted salaries for people who were not employees), affg. sub. nom. Norie v. Commissioner,3 T.C. 676 (1944); Gano v. Commissioner,19 B.T.A. 518, 533 (1930) *384 (inter alia, petitioner deducted gambling losses as a loss "by fire, storm, etc."); cf. Dorsey v. Commissioner,33 B.T.A. 295, 299 (1935) (petitioner labeled ordinary income as capital gain on his return). On the partnership's 1959 information return filed with the State of California, the partnership deducted $9,000 of bribes to public officials under such varied labels as "professional fees", "handling costs", and "service costs", and petitioner was aware of this fact.The purpose of these labels was to conceal from respondent's auditing agents the nature of the payments which petitioner and his partners were making, and petitioner realized that these labels would have this effect. On the information returns for its last three fiscal years, 1961 through 1963, the partnership continued to use misleading labels for its bribes, a usage of which petitioner continued to be aware. As we have indicated in our findings, in 1960, 1961, 1963, and 1964, petitioner also used labels on his returns in describing his bribes which were calculated to mislead or deceive. Although no such labels appear on his returns for 1959 and 1962, petitioner was aware in those years *385 of the partnership's use of misleading categories. F. Preparation of tax returns.
In each of the years in issue, petitioner employed one of the recipients of his bribes, Michael J. McLaughlin, to prepare his income tax returns. We can hardly view as mere inadvertence petitioner's decision to select as his tax preparer a person with so deep an involvement in petitioner's illicit activities and with so great a stake in keeping these activities hidden. Petitioner knew that McLaughlin would accept without question the information petitioner presented him in a summary form very near the filing deadline. Petitioner's use of such a tainted artisan suggests to us an awareness of a tained product. The preparation of petitioner's 1964 individual tax return revealed another badge of fraud. In that year McLaughlin told petitioner that he had deleted deductions totaling almost $30,000 (representing bribes) and lowered gross income by the same amount. Although McLaughlin discussed these deletions with petitioner, petitioner did nothing to rectify these omissions of almost $30,000. After considering all of these various factors as they applied to each of the six years in issue, *386 we conclude that respondent has clearly and convincingly established fraud for each year. Given our finding of fraud in 1959, 1960 and 1961, the statute of limitations is not applicable to these years. Section 6501(c). II. Specific Items of Income and Deductions.
We now turn to the issues raised in relation to respondent's reconstruction of petitioner's income.Respondent employed the specific item method of income reconstruction under which he evaluates individual items of income or deduction to determine whether they were properly reported. His reconstruction is presumptively correct, leaving petitioner with, at the minimum, the burden of going forward with the evidence to establish a prima facie case. Clark v. Commissioner,266 F. 2d 698, 706 (9th Cir. 1959).
The parties have raised many issues, some legal and some factual. We shall first consider partnership payments to petitioner, and the partnership's and petitioner's payments to third parties. We will then analyze petitioner's other sources of income. After that, we will move to business expense disputes, *387 and we will end with questions involving itemized deductions. A. Partnership payments to petitioner.
(1) Escaping Costs.
From 1959 through 1963, the partnership paid petitioner $25 per week as escaping costs, i.e. amounts allegedly to reimburse petitionr for miscellaneous business expenses. Respondent determined that these payments were income to petitioner in the following amounts: 1959
$1,025
1960
1,300
1961
1,350
1962
1,300
1963
1,100
Respondent justifies this conclusion by arguing that petitioner has not established that he incurred any expenses for which he was being reimbursed, and we agree. We have carefully analyzed the record for each year but have found no credible evidence which establishes that petitioner incurred any expenses for which he required reimbursement. Rather, these regular payments are in the nature of guaranteed payments made to petitioner without regard to the income of the partnership. Section 707(c). As such, these payment s are treated as if they were made to an employee. Such payments to an employee would clearly be compensation and therefore constitute ordinary income under section 61(a).See Turner v. Commissioner,56 T.C. 27, 33 (1971) *388 (reimbursements by corporate employer for expenses not accounted for by employee are includible in gross income); cf. Cockrell v. Commissioner,38 T.C. 470, 477-479 (1962), affd. 321 F. 2d 504 (8th Cir. 1963); Yeomans v. Commissioner,5 T.C. 870, 875 (1945). (2) Commission and other payments from the partnership to petitioner. Respondent in his statutory notice determined that petitioner failed to report the following items of income: 1961
Detail
Income
Pacific Play Togs
$ 1,500
Jack Tar Hotel
$9,409.60
less share to partnership
3,450.18
5,959.42
Commissions: Jersey Shore Steel
34.62
MJB
25.90
Gerber Foods
400.00
Oliver Tire & Rubber Co.
2.50
Pacific Tire Co.
25.00
Tax Management Associates
5,929.00
Unreported partnership
gross receipts
2,693.35
Total for 1961
16,568.89
1962
10% partnership commission
712.31
10% partnership commission
6,124.00
Total for 1962
6,836.31
Respondent further determined that petitioner *389 reported the 1961 items on Goldleaf's returns. On brief, respondent contended he was in error when he determined that the 1961 Pacific Play Togs and Jack Tar payments were made to petitioner by the partnership. He now contends that these two payments were made directly to petitioner by the clients in petitioner's capacity as a sole proprietor. Since respondent's present position is inconsistent with his position in the statutory notice, and since the evidence petitioner would need to rebut the latter differs from that needed to rebut the former, the burden of persuasion shifts to respondent. Estate of Falese v. Commissioner,58 T.C. 895, 898-900 (1972); McSpadden v. Commissioner,50 T.C. 478, 491-493 (1968). We think respondent has failed to show that the 1961 Jack Tar payment was made to petitioner as an individual rather than to him on behalf of the partnership. The evidence in the record only indicates that the Jack Tar Hotel made a payment to petitioner who then deposited the fee in the Goldleaf account, shared a portion of it with Dawson, *390 Desmond and Van Cleve, and paid off Wolden through Yeo from his Goldleaf account. However, whether paid to him directly by the client or distributed to him as part of his share of the profits of the partnership, it is taxable to him as ordinary income. We conclude that respondent has met his burden concerning the 1961 Pacific Play Togs payment. The parties have already stipulated that a comparable payment in 1962 was made to petitioner as a sole practitioner. The 1961 bill prepared by petitioner was not on partnership stationery; there is no mention of the partnership on any document, and the resulting payment was deposited in Goldleaf's checking account and was listed on petitioner's records. Under these circumstances, we think that respondent has met his burden. All other payments noted above, including the payment from Tax Management Associates, were payments made to petitioner from the partnership as part of his share of partnership profits under the partnership agreement. Petitioner contends, as a factual matter, that respondent did not submit any evidence into the record concerning the method the partnership used to compute petitioner's reported distributive share *391 of partnership taxable income and so respondent cannot know whether these various payments are reflected in it. However, this argument assumes that respondent has the burden of proof whereas the burden of proof lies with petitioner, and properly so since he is in a much better position than respondent to prove the method used to compute his distributive share of partnership income. Since the statutory notice carries a presumption of correctness and since petitioner introduced no evidence on this point, we hold that the amounts involved were not reflected in petitioner's reported distributive share of profits from the partnership. Petitioner next argues that, as a legal matter, these payments are necessarily either partnership distributions under section 731 or reimbursement for partnership expenses. Petitioner does not explain why he concludes section 731 is applicable.Generally speaking, section 731 concerns changes in a partner's capital account whereas here we are concerned with distributions of current partnership profits to petitioner. There is no evidence that petitioner was being reimbursed for partnership expenses in connection with any of these payments. Such amounts *392 appear to be advance distributions to petitioner of current profits of the partnership taxable to petitioner as ordinary income under section 702(a)(8), and treated as if distributed on the last day of the partnership year. Section 1.731-1(a)(1)(ii), Income Tax Regs.
B. Partnership and James C. Tooke & Associates payments to public officials or on their behalf. (1) Payments to Public Officials. Respondent, in his statutory notice, determined that payments made by the partnership and James C. Tooke & Associates directly to members of assessor's staffs or their relatives were not allowable as deductions because they were not ordinary and necessary expenses and because they were bribes. Respondent therefore increased petitioner's income by the entire amount of payments made by his sole proprietorship, i.e., the $1,675 payment to McLaughlin in 1960 and the $1,650 payment to Ralph Yeo in 1960, and by petitioner's one-third share of the following disallowed partnership deductions: 1959
1960
1961
1962
1963
Max Newstat
2,200
3,810.54
687.35
8,406.42
Art Spriggs
2,062.50
600
Michael McLaughlin
1,675
3,544.95
Orion Baker
366
Don James
550
700
Ralph Yeo
1,650
TOTAL
4,862.50
7,235.95
4,360.54
687.35
9,106.42
*393 Petitioner criticizes, as an initial matter, respondent's methodology. He argues that respondent must, as a matter of law, determine that the partnership actually deducted these expenses on its returns before respondent may increase petitioner's distributive share of partnership income. By failing to do so, petitioner asserts, respondent has acted in an arbitrary and capricious manner. We disagree. We consider it quite reasonable, in light of the partnership's motives behind its preparing of false bills, for respondent, at the stage of issuing his statutory notice, to assume that the partnership deducted such payments. In essence, petitioner's argument constitutes an attempt so to expand the notion of arbitrariness as to diminish the scope of his burden of persuasion. Even though many of the relevant partnership records may have been located in New Jersey, petitioner was certainly in a better position to investigate them than was respondent. Such ease of inquiry is one of the principal factors justifying the presumption of correctness accorded to respondent's statutory notice. *394 United States v. Rexach,482 F. 2d 10, 16 (1st Cir. 1973), cert. denied 414 U.S. 1039 (1973). Thus we think petitioner is the proper party to bear the burden of establishing that the partnership did not deduct these expenses. Since petitioner has failed to establish this, we must decide against him on this issue.
Petitioner then contends that, even if the partnership deducted these expenses, petitioner is only taxable on his distributive share of partnership income, and that respondent has failed to determine petitioner's distributive share. Respondent has attributed only petitioner's share of these amounts to petitioner. We think respondent has adequately, even if summarily, indicated the effect on petitioner's distributive share resulting from the disallowed deductions. If, however, an error was made, the burden of so showing again rests on petitioner, who has failed to meet this burden. Petitioner next argues that respondent is incorrect and that the partnership's payments to government officials and employees from 1959 through 1963 as well as petitioner's payments in 1960 and 1964 are ordinary and necessary business expenses and therefore *395 are deductible under section 162. He contends that they were appropriate, helpful, and ordinary in the business of property tax consulting.He argues that such payments to county tax assessors were widespread, and that if the partnership and James C. Tooke & Associates had not made them, they could not have competed successfully for clients. However, petitioner has failed to prove that these payments were in fact widespread and that there were not others in his profession who were carrying on their business without resorting to bribing officials. An important element in a finding of "ordinary" is that the expenditure is customary within the taxpayer's line of business. Lilly v. Commissioner,343 U.S. 90 (1952) (commercial kickbacks); Deputy v. duPont,308 U.S. 488, (1940); Welch v. Helvering,290 U.S. 111, 114 (1933); cf. Valetti v. Commissioner,260 F. 2d 185, 186-187 (3d Cir. 1958) (commercial kickbacks); Diamond v. Commissioner, 56T.C. 530, 542-543 (1971) (commercial kickback); United Draperies, Inc. v. Commissioner,41 T.C. 457, 463 (1964) *396 (commercial kickback), affd. 340 F. 2d 936 (7th Cir. 1964), cert. denied 382 U.S. 813 (1965). Petitioner, upon whom the burden of persuasion lies, has not shown that the practice of bribery was common among other firms in his field. The only indication we have that any others may also have bribed assessors is the numerous criminal indictments where one or two others are named along with petitioner and his partners as bribing assessors. This in no way establishes a custom in the industry. We conclude that petitioner has failed to prove that bribes paid by him were "ordinary." Respondent contends that the payments listed above are not only not ordinary and necessary business expenses but also are nondeductible as bribes under section 162(c)(1), which provides as follows: No deduction shall be allowed under subsection (a) for any payment made, directly or indirectly, to an official or employee of any government, or of any agency or instrumentality of any government, if the payment constitutes an illegal bribe or kickback * * * The burden of proof in respect *397 of the issue, for the purposes of this paragraph, as to whether a payment constitutes an illegal bribe or kickback * * * shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).
Section 1.162-18(a)(2), Income Tax Regs., defines an indirect payment to an individual as a payment which inures to his benefit or promotes his interests regardless of the medium in which the payment is made and regardless of the identity of the recipient or payor. Examples are payments made to an agent, relative or independent contractor. Section 1.162-18(a)(3), Income Tax Regs., defines an official or employee of a government as any individual officially connected with the government of the United States, a state, a territory or possession of the United States, the District of Columbia or the Commonwealth of Puerto Rico, or a political sub-division of any of these political entities serving in any capacity and regardless of compensation. In order *398 to meet the burden of proof of clear and convincing evidence, respondent need not establish a criminal conviction or a plea of guilty or nolo contendere. See Conf. Rept. No. 91-782, 91st Cong., 1st Session (1969), 1969-3 C.B. 644, 676.
It is clear that under the law of California, bribes paid to or received by public officials or employees are illegal. The principal statutes prohibiting this conduct are Cal. Penal Code, sections 67, 67-1/2 and 68. Section 67 provides that every person who gives or offers any bribe to any executive officer in California with intent to influence him in respect to any matter involving his official duties is guilty of a felony. Section 67 1/2 provides that any person who gives or offers any bribe to any ministerial officer, employee or appointee of the State of California, county or city therein or political sub-division thereof is guilty of a felony or misdemeanor, depending on the size of the bribe. Under section 68, every executive or ministerial officer, employee or appointee of the State of California, county or city therein or political *399 subdivision thereof, who asks, receives, or agrees to receive, any bribe upon any agreement or understanding that his official duties will be influenced thereby is guilty of a felony. Additionally, section 222 of the Charter of the City and County of San Francisco, Rule 36 of the Civil Service Commission of the City and County of San Francisco and section 66 of the Charter of Alameda County, all prohibit as improprieties any undertaking or employment which would conflict with or influence the performance of any official duties. Section 66 of the Charter of the County of Alameda specifically prohibits any officer or employee receiving any money or thing of value or any benefit or advantage directly or indirectly from or by reason of any dealings with or service for the County, except his lawful compensation. The question of whether bribes have been paid within the meaning of section 162(c)(1) is predominantly a factual one pursuant to which all the facts and circumstances are to be considered. We conclude that respondent has shown by clear and convincing evidence that at least the *400 following payments were bribes under section 162(c)(1): 1959
1960
1961
1962
1963
Max Newstat
$2,200
$3,810.54
$687.35
$8,406.42
Michael McLaughlin
$1,675
Don James
700
We have found as facts that in 1962, 1963 and 1964, petitioner received payments from the Jack Tar Hotel. He seeks to deduct from this income the following amounts which he paid over to Ralph Yeo: 1962
2,500
1963
1,550
1964
1,750
We conclude, however, that he is not entitled to deduct these Yeo payments because respondent has established that they were bribes.We also conclude that a $3,750 payment to Yeo in relation to the 1964 American Can Company assessment was a bribe. Petitioner also seeks to deduct as business expenses (although not claimed on his returns) payments he made in 1964 to McLaughlin, Parrish and Newstat. We conclude that one 1964 payment of $300 to McLaughlin was a bribe, that two 1964 payments of $2,000 each to Parrish were also bribes, and that payments of $4,457, $4,458 and $2,185 to Newstat were bribes. (2) Partnership Entertainment of Public Officials. From 1959 through 1963, the partnership entertained *401 various public officials. Respondent in his statutory notice determined that the following entertainment expenses were includible in petitioner's income and not deductible by the partnership: Year
Partnership's Expense
Petitioner's 1/3 Share
1959
$ 182
1,109.81
$1,291.81
$ 430.60
1960
1,134.40
378.13
1961
771.50
257.17
1962
364.64
121.55
1963
277.73
92.58
Respondent, in addition, disallowed a deduction of $182 in 1959 as petitioner's portion of partnership expense for entertainment of Newstat and Wolden. Respondent contends that these are not ordinary and necessary expenses. Petitioner's sole argument in opposition is that there is no evidence indicating that the partnership actually deducted these expenses. We have already discussed and rejected this argument.Petitioner submitted no evidence on the merits of this issue, leaving us no choice but to find for respondent. C. Other tax consulting related income. In 1960 the partnership paid Michael McLaughlin $6,000. McLaughlin then paid $2,600 of this sum to petitioner. Petitioner did not report this sum on his return. Respondent determined that this kickback *402 was income to petitioner. Petitioner's testimony that this was repayment of a loan is unpersuasive. Since petitioner, on whom the burden of persuasion lies, submitted no credible evidence on this issue, we must decide in favor of respondent. Respondent in his statutory notice determined that petitioner, in his capacity as a sole proprietor, received net fees from the Jack Tar Hotel of $4,227.74 in 1962 and $3,167 in 1963. Petitioner contends that Jack Tar paid the partnership, rather than petitioner. Respondent asserts that the payments were made to petitioner, and we agree. Petitioner bears the burden of proof concerning the Jack Tar payments. He has, however, failed to show that the partnership played any role in relation to these payments. On the contrary, the documents entered into evidence in relation to these payments consistently refer to petitioner individually, not in his role as a partner. Petitioner further argued that if these payments are included in his income, then he is entitled to deduct certain payments that he made to Ralph Yeo. We reject this argument, since, as we indicated above, these payments were bribes and therefore not deductible. D. Non-tax-consulting *403 income. (1) Unidentified Bank Deposits. Respondent determined on the basis of the bank deposits method that petitioner had $455 in income (in 1959) which he had failed to report. Petitioner raised several legal arguments in relation to respondent's method. He contended that for respondent to focus only on one or two bank deposits and then not to identify the source of the ones he found suspect is arbitrary. He also asserts that respondent cannot employ the bank deposits method in relation to only a few deposits. We disagree. This Court has in the past approved just such a method. Hollman v. Commissioner,38 T.C. 251, 261 (1921); cf. O'Dwyer v. Commissioner,28 T.C. 698, 705 (1957), affd. 266 F. 2d 575 (4th Cir. 1959), cert. denied 361 U.S. 862 (1960). Thus the burden of persuasion remains with petitioner who, however, has offered no evidence on this issue and has not employed any other method of reconstruction to refute respondent. We find for respondent. (2) Rental Income. Petitioner owned several rental units during the years in issue. Petitioner concedes receipt of $236.83 in unreported *404 rental income in 1960. For subsequent years respondent determined the following amounts of unreported rental income: Year
Amount
1961
$1,230.19 [6]
1962
503.60
1963
1,157.35
1964
900.79
The components of these amounts include rental income improperly reported by Goldleaf, improper expensing of capital expenditures, income on petitioner's rental records which exceed his reported rental income, and unidentified bank deposits for 1964.Petitioner did not provide any credible evidence on any of these issues and questioned only one of them on brief. He contends that respondent's 1964 determination that certain unidentified bank deposits were income to petitioner is arbitrary. For the reasons we indicated earlier, we disagree. Since petitioner has failed to carry his burden of persuasion, we decide in respondent's favor. E. Business expenses . In 1960 petitioner paid his brother $4,000 and, in 1961, $4,207.81, and deducted these sums from his individual tax returns. Respondent disallowed these payments as deductions on the ground that they were not ordinary and necessary business expenses. Petitioner's testimony *405 that these amounts were compensation for services rendered is not persuasive. Petitioner, who bears the burden of persuasion on this issue, has failed to submit any credible evidence concerning these payments. We therefore decide in favor of respondent. Respondent determined that petitioner was not entitled to $503.19 of deductions in 1963 and $2,126.75 of deductions in 1964. Petitioner introduced no evidence at trial indicating that these were ordinary and necessary business expenses.Since he has failed to meet his burden of persuasion, we find for respondent on this issue. Petitioner claimed other business expenses on his 1963 and 1964 returns. Respondent determined (1) that the partnership had reimbursed petitioner for $1,149.93 of expenses which he deducted in 1963, (2) that petitioner's deduction of $567.17 for 1963 travel expenses was not an ordinary and necessary expense, and (3) that petitioner's spouse's auto expenses in 1963 and 1964 were not ordinary and necessary. Petitioner contested on brief only respondent's determination concerning his wife's Cadillac expenses and the other 1963 expenses. Petitioner, however, failed to submit credible evidence on any of *406 these issues, including the auto expense. Therefore we hold against him. F. Additional business deductions not claimed on petitioner's return. For 1962, 1963 and 1964 petitioner in his petition claimed large, additional amounts of business deductions which he alleges he failed to deduct in his original returns. His additional claim for 1962 is $4,635.60, for 1963 is $9,531.40, and for 1964 is $30,758.81.The additional expenses range from advertising, telephone, clerical, accounting, and entertainment expenses, to referral fees. On brief, petitioner conceded certain of these items for each year. In support of his additional claims for 1962 and 1963, petitioner submitted into evidence certain handwritten sheets containing figures representing yearly totals for certain expense items, such as entertainment and advertising. Petitioner conceded that a portion of each expense category was properly allocable to Goldleaf. To implement this allocation, he multiplied each expense category in each year by a fraction whose numerator was petitioner's tax consulting income for that year and whose denominator was the total of petitioner's tax consulting income for that year and *407 Goldleaf's income for that year. Petitioner contends that the resulting figure represents expenses incurred in his tax consulting business which he did not deduct on his original returns for 1962 and 1963. We reject petitioner's argument for a variety of reasons. We first observe that petitioner has failed to substantiate his expense summaries. He failed to submit into evidence any of the underlying receipts or documents which allegedly formed the basis for his summaries. The only evidence in the record supporting these summaries is his oral testimony, but we found his testimony to be totally lacking in credibility. For certain of the items, he used certain ledgers and check registers to refresh his memory. However, he failed to submit these into evidence. Although we recognize that due to the requirements of various criminal proceedings petitioner was deprived of many of his records, we find his decision not to submit into evidence those records which he still possessed to be inexplicable and open only to adverse inferences. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (10th Cir. 1947). *408 Moreover, there is no evidence confirming petitioner's allocation fraction. On the contrary, petitioner himself indicated that, for certain expense categories, the amount properly allocable to Goldleaf exceeded its share under the allocation fraction. Petitioner has simply failed to establish that his fraction approach adequately reflected the actual division of expenses between Goldleaf and petitioner's tax activities. Cf. Larsen v. Commissioner,66 T.C. 478, 483-484 (1976). Concerning his claimed 1963 entertainment expenses, we further conclude that petitioner has failed to meet the substantiation requirements under section 274(d). Section 1.274-5, Income Tax Regs. We finally observe that, aside from petitioner's testimony which we have already indicated was incredible, there is no evidence establishing that these expenses were not, at least to some degree, already claimed on his original income tax returns for 1962 and 1963. In support of his claims for additional deductions for 1964, petitioner did not submit a summary sheet but instead testified from a ledger and check register. As was the case for 1962 and 1963, he failed *409 to submit these underlying documents into evidence. We are thus left with nothing to supplement his unpersuasive testimony. We also observe that the record contains no credible evidence from which we could conclude that petitioner had not already claimed these expenses on his 1964 return. We further conclude that petitioner has failed to substantiate adequately his entertainment expenses. Section 1.274-5, Income Tax Regs. We finally note that we have earlier concluded that some of petitioner's additional claims are disallowed as bribes. G. Itemized Deductions. In 1960 petitioner loaned $1,550 to Art Spriggs. In the same year petitioner concluded that the debt was worthless and deducted $1,000 of it as a short-term capital loss. In 1961 he deducted the remainder. Respondent disallowed the deduction, contending that petitioner had failed to establish worthlessness. We agree with respondent. There is no credible evidence in the record from which we could determine the year of worthlessness. Petitioner has failed to carry his burden of persuasion with respect to this issue. Cf. mathews v. Commissioner,61 T.C. 12, 27 (1973), *410 revd. on other grounds, 520 F. 2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). In 1963 petitioner purchased a new automobile and paid $249.12 in sales tax. On his return he claimed a deduction of $500 for sales tax. Respondent allowed only $180 as a deduction. We have found as a fact that petitioner purchased this auto, paid $249.12 in sales tax on it, and otherwise paid $180 in sales tax in 1963. We therefore hold for petitioner on this issue to this extent. Decision will be entered under Rule 155.* Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. The partnership initially paid $6,000 to McLaughlin but, pursuant to expense allocation agreements between it and Dawson, Desmond and Van Cleve and Tax Management Associates, it ultimately shouldered only this amount of the expense.↩
3. The record does not indicate the modification of the basic formula which evidently occurred to produce a sum which is $50 greater than the product of 52 weeks times $25 per week.↩
4. In addition, petitioner did not contest and therefore implicitly conceded respondent's determination that petitioner's 1964 income should be increased by $29,645.18 (which represents the amount of income deleted by Michael McLaughlin, petitioner's income tax return preparer), less $433 of expenses allowed by respondent.↩
5. Respondent's ninety-day letter characterized this $275 item as "lease deposits" but treated them as income.No evidence regarding this item was introduced. Lease deposits are normally not income ( Mantell v. Commissioner,17 T.C. 1143, 1148↩ (1952)) and in view of respondent's admission we exclude this item.
6. Section 6653(b), in relevant part, provides: (b) Fraud.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *↩
6. See footnote 5 on page 27.↩